Good morning, Your Honors. May it please the Court, my name is Shannon Liss-Riordan. I'm here on behalf of the objectors. I'd ask to reserve some of my time for rebuttal. Okay, how much do you want to save? Two minutes, please. Okay, fine. Okay, thank you. Your Honor, I'm here today because the settlement that was reached in this case, and it was approved by the district court, did not take into account any real analysis of whether the amount of the settlement was fair, adequate, and reasonable to the class in this case. The district court, while she – well, the magistrate judge who was serving in the district court – while she parroted language from cases regarding what courts should consider on settlement approvals, did not really grapple with the fact that there is a substantial body of case law around the country that has resulted in substantial recoveries and substantial settlements for claims of the very type at issue here. There were claims involving wage claims brought by exotic dancers, claiming they'd been misclassified as independent contractors. Counsel, let me just understand structurally how this works. There were two other class actions that asked to piggyback on this case. Are you involved in any way with either of those other cases? Yes, yes. So I'll tell you the history. I represented dancers in two cases, the Hughes and Parra cases. When I filed those cases, I had no idea they were overlapping in any way with this case, because this case was filed against an entity called SFBSC Management. We didn't even realize that was related to our case, because we had sued a couple – several of the clubs themselves. After I had filed those cases, it came to my attention that there was this other case that was already out there that had been litigated, had gone to the Ninth Circuit for ruling on the arbitration clause. At that point, I said, oh, okay, we didn't – sorry, we didn't know this had already been filed. The plaintiff's lawyer and I spoke. He said, actually, we're mediating, and he invited me to attend the mediation. I said, sure, however, I might help if you'd like my help. Then the defendants found out that I had been invited to the mediation. They disinvited me from the mediation. I said, okay, fine. So I stepped back to wait to see what would happen. And my cases were put on hold while that process happened. You said your cases, so there's more than one case. The two, the Hughes case and the Parra cases, which were related to this case, so they went before the same judge. So my cases were put on hold during the settlement process. I stepped back just to see what would happen. And then — Kennedy, just so I understand — Yes. Kennedy, in effect, you are a competitor of the lawyers that are representing the rows in this case, right? Yes. Yes, that's correct. And yet — Go ahead. Are your cases still under hold? Excuse me? Are your cases still under hold in the district courts? Well, so — Are they going ahead now? No. So my cases are going forward because, for a couple of reasons, some of my clients opted out of the settlement. And there's also a time period after the release for this settlement that we were trying to capture in our new cases. But interestingly enough, as we submitted just last week, now what this defendant has done is they have colluded with another plaintiff's counsel to try to scoop up the rest of the case that we were still trying to proceed with. So they've settled yet another case in state court in San Diego to try to cover the time frame following the time frame of this case. And it's another settlement which would give about a million dollars to dancers, despite the fact that the claims could be worth more than $100 million. On behalf of my clients, I've objected to that settlement now. And the state court judge there declined to grant preliminary approval at a hearing a couple weeks ago. And so that's in progress. So that's sort of more of the back story of what's going on. Essentially, the defendant here, it's a chain of clubs, a national chain of clubs, Deja Vu. Kennedy, so your two cases, then, are still at a standstill? Well, no. Actually, we had a hearing just yesterday. In one of my cases, the Court granted our motion to amend to add in an additional plaintiff who's not bound by an arbitration clause and to proceed with our claim. So I'm still trying to move those cases forward. But now, Deja Vu, the defendant here, is trying to settle out my claims in another competing case in the state court. So it's all in a bit of flux right now. With respect, it is kind of bizarre that the objectors really are you. And I don't know whether you have other lawyers involved in this. But it's kind of like it's lawyers competing with the business for the other lawyers, because it's all the exotic dancers here. And I don't know exactly how that works. Is there a conflict? Are you affected in any way by this conflict, if there is one? No, I'm not aware of any cases that have said that's a conflict for me to raise these objections. The issue before the Court, what the standard is for settlement approval, is whether a settlement is fair, reasonable, and adequate. Regardless of this background, I didn't jump into this in order to try to take over another plaintiff's case. I stepped back. And when I saw what the settlement was, I've been litigating these types of cases for my whole career, with a special specialization in independent contractor misclassification and exotic dancer cases in particular for more than a decade. When I saw the settlement they reached here, I was shocked. My clients were shocked and very upset. And that is why I stepped forward to do this objection. Had this been a reasonable settlement, I would have said, okay, fine, I wasn't the first to the table. I made a mistake. I would have stepped back. The reason that I'm here pressing this objection and the objection to the district court's approval of the settlement is because this settlement, if it stands, is going to set back substantially rights that have been established and successful for years. Kennedy, now you've used up 6 minutes of your time. We're finally to the issues. So the main issue you're raising is that whether or not this settlement meets the Rule 23 standard of being fair, adequate, and reasonable, and you say it's not. Tell us why it's not. Yes. It is not because the value of the primary claims in this case, the plaintiffs agreed, could have been $115, $116 million. This settlement would give less than $1 million to a huge class. Did Judge Bieler set that? Yes. That amount as a reasonable value of the overall claim? Yes. She didn't quarrel with that. She said she still thought that this was okay. A single digit recovery. We cited numerous cases in which these types of cases have gone forward to judgment and dancers have received on the order of tens of thousands of dollars each, even more than $100,000 each when they brought these cases all the way. And we also set forth 20 cases around the country ruling in favor of dancers making these claims. We also set forth a string site of settlements in which this type of claim has been settled for, with dancers getting tens of thousands of dollars each, even in a class settlement, or thousands of dollars each. The court didn't really grapple with that and didn't really compare this case to those benchmarks, and instead thought that a single digit percentage recovery was acceptable because she cited a few other cases where there have been some courts out there that have approved single digit recoveries in completely unrelated cases, consumer class actions, with no analysis about whether the issues there were at all similar to the fact that this exact kind of claim has amounted to exponentially higher amounts of judgments and settlements on a per-dancer basis and even in class settlements. So even though the damages here could have amounted to well over $100 million, but the class here would get less than a million, typically in the settlements that we've marshaled and the judgments we've marshaled, a million dollars for a class of dancers that's been typical when you have, say, one club or a few hundred dancers. This was a settlement that covered more than ten clubs and more than 4,500 dancers. The closest comparison we had was the Ricks case out of New York, where there were a couple of thousand dancers, and then the case ultimately settled for $15 million cash, without even considering the issues of reversionary payments or whether a non-monetary relief has any cash value. So the reason that I'm here challenging this, there were serious issues with the reversionary nature of a portion of the settlement, the valuing of so-called prospective injunctive relief, which was really the club saying it would do what it had already supposedly been doing for years, and the fact that coupons were a part of the settlement. But even putting those issues aside, which I'll rest on what we've put in the briefs, is even if you counted all of those portions of the settlement, the settlement was still only what everyone acknowledged was no more than 5 percent, really more like 1.7 percent or perhaps 4.3 percent of the potential recovery, and there was just no grappling with whether that was adequate here. Now, one of the arguments that the parties make is, oh, there was an arbitration clause, so these dancers may not have been able to pursue their claims because of the arbitration clause. Well, first of all, in this case, the arbitration clause had been defeated. The district court ruled that it was unconscionable, and the Ninth Circuit affirmed, albeit on different grounds, that the arbitration clause wasn't enforceable. So that wasn't a barrier in this case. But even if somehow arbitration still ended up rearing its head again and becoming a barrier, an arbitration clause is not a license to value a significant claim at close to zero, which is what this case did. Just because individuals may have to pursue claims in arbitration doesn't mean they don't have any value. In fact, we pointed to cases where dancers have been very successful for dancers in arbitration. Well, the magistrate judge, though, reversed herself then when it came back down on the arbitration clause, didn't she? No. In this case that's before you, the Roe case, the arbitration clause was not enforceable. I think what you're referring to is that in my case, after the fact, after she had approved the settlement, I objected, she then said, oh, you know, I'm going to change my mind now. I actually find it not to be unconscionable. And even though the defendants had expressly waived arbitration in our case, she said, I'll let them take it back. So that's an issue that's still being fought out in my case, which I may still take to appeal. But my point is, is that even if arbitration somehow ended up being relevant here, it's not a justification for saying that claims are worth zero. These are still highly valuable claims. But aside from the overall amount, is there a, like a per person maximum recovery? So what happened here is the, if all of the dancers in the class had participated Never mind all the dancers. Is there a upper limit for per person recovery? So there's no upper limit. But what ended up happening, because of the Does that mean then the few dancers who did file claims, they get to divide amongst them the entire million? Yes. So now there's the 18.5 percent of the class. So they come to What is their recovery? It's somewhere between $1,000 and $1,500 or $1,800 each, because there was such an abysmally low claim rate. All of the settlements that we cited and the judgments we cited were based on the entire class. So we showed that typically these settlements are in the many thousands of dollars or even tens of thousands of dollars for individual dancers, if you count everyone in the class. They said, well, the dancers who participated here are going to get on the order of $1,500 or so, only because only 18.5 percent of them responded to the single mail notice that was sent out. So it's not an apples to apples comparison of the cases we've cited, which have substantially higher recoveries per dancer. So the problem here, Your Honors, the Northern District of California has recently adopted new rules for class action settlements in which it has given guidelines for how district courts should consider whether to approve settlements. Should this court affirm this approval of the settlement, this will just, it will really render, make a mockery of the process, I'll have to say, frankly, that the courts are going to be very focused on nitpicky details about what notices look like, but missing the big picture of it's the court's role to actually look at the particular case, look at a particular settlement, determine whether or not the amount recovered is reasonable, is fair and reasonable for the class in light of the particulars of the case and looking at reasonable benchmarks. The district court here, the magistrate judge, just looked at no benchmarks and just said, oh, there are some cases that have settled for very little and these have done a very good job. And then also, of course, there's the PAGA claim. There's a PAGA claim which could have, which would not be affected in any way, of course, by arbitration because of the Sokob case. But the court just, the parties didn't even try to value it or explain it. Now, district courts have very commonly in California approved class settlements with small valuations for the PAGA claim when they've been robust settlements for the class. But there's been some indication that if the settlement itself, the class settlement is not robust, the court can't just turn a blind eye to the fact that potential PAGA claims, which could be extremely valuable even in the face of arbitration clauses, can't then just be settled away for almost nothing with no comparison to the actual potential recovery. And in fact, I think we've submitted in the record a case that I'm also litigating against defense counsel here, which is a PAGA-only case for dancers at one club that's made progress. We've won summary judgment. We're set for a trial in the spring. We could very well be looking at millions of dollars in penalties against one club for a few hundred dancers just on PAGA alone, even though there's an arbitration clause. There's just no grappling here with the fact of why less than $1 million for more than 4,000 dancers is justified in this case. Thank you, Your Honor.  Thank you very much. Now, I understand you all are dividing up time. Is that the – what's the understanding? So counsel for defendant will speak for seven and a half minutes and I'll have seven and a half minutes. Okay. And you're – okay. Very well. And you've got the time set for that. Great. Thank you. Good morning. May it please the Court. I'm Doug Melton on behalf of the defendant appellee. I'd like to start by just clarifying that the Hughes and Pera cases, which are pending before Judge Buehler in the district court, all of the plaintiffs in the Pera case have been ordered to individual arbitration. Most of the plaintiffs in the Hughes case have also been ordered to individual arbitration. The plaintiffs have sought leave to amend the complaint to add a new plaintiff who they contend is not subject to an arbitration agreement, and we'll see how that plays out. I'd like to turn to the issue of – of the judicial value in avoiding arbitration in connection with the settlement. That is my point. And also just to clarify where things stand. What's that? It's worth looking at the merits of the underlying case in determining whether Judge Buehler erred in finding that the settlement was reasonable. Counsel, before you get to that, and I don't know whether you or the other person should answer this, but I'm really troubled by the notice issue in this case. If I understand it correctly, you had a mail notice. Then with respect to the returns, you had a service or somebody that helped you try to track some more people down. But I think ultimately – I forget how many people were not contacted, at least in terms of a new address. Out of that total, we had a relatively small number that actually participated. Will you address the notice issue? I mean, obviously, that's a big deal. There are other people who do different things. I think somebody filed an amicus brief in connection with these kinds of cases where they suggested other electronic means that might be used. In short, help us out with this notice issue. Yes, Your Honor. So it was mailed notice. There was a proposal for email notice. And the nightclubs simply don't have email addresses for the entertainers. Exotic dancers are a uniquely itinerant class. They're a group of people who often are sort of underground. That's challenged in the briefing. Pardon me? That's challenged in the briefing. Well, and, Your Honor, I don't agree that it's successfully challenged. The reality is that exotic dancers often have careers during the day, and they don't want their family members, their spouses, their employers to know that they are exotic dancers. And so the mailed notice was a discreet mailing. There was also a poster posted in the dressing rooms of the nightclubs. And really, in some respects, that's the most effective way to get to a class of entertainers or a class of individuals who do not want to be contacted. How do you know that? Well, because the experience of the clubs in interacting with the entertainers confirms that entertainers value their privacy and very much request that that not be violated. In fact, this case was filed under pseudonyms to protect the identities of the entertainers. But, you know, you can make an argument just the opposite of what you made. In other words, posting at the club is only going to get those dancers who are working at the club, right? And if this is an itinerant group, people who are not working obviously are not going to come in the club to look at the notice, and those are the people you need to get. Well, Your Honor, I would say that. And obviously, also, those are the people for whom the defendants are likely to have addresses because they're working for them. You know, if you work for somebody, you've got to give them their address, right? So you can, you know, send in the W-2s and stuff like that or whatever it is. So you can make your argument just to the opposite that posted notice with the club is, like, least likely to reach anybody other than the people who get the mail notice. Well, Your Honor, the notice was mailed. That's what I said. You said adding the poster, you know, is additional notice, but it only is going to reach the people who get the mail. Well, and the other people whose addresses the clubs have. Your Honor, I guess the point I would make is that to the extent that the mailing didn't reach the entertainer, the fact that it's posted at the club is a backup notice. And when I say that the entertainers are itinerant, they often cycle through different nightclubs. This poster was posted at 10 of the 12 nightclubs in San Francisco. This was information that was sort of out in the network, if you will, of exotic dancers who perform in and around the Bay Area. Your clients send W-2s? 1099s, Your Honor. They were classified as independent contractors. That's right, because they're independent contractors, so you'd send 1099s. That's correct, Your Honor. Turning to the merits of the case. Well, did you consider or did the court consider, like, for instance, electronic notice? I understand I've read in somebody's brief there's a website called strippers.org or .com or something like that, right? It's a White House address. There was an address that apparently exotic dancers visit, or did you consider, like, say, you know, certain social media advertisements, anything like that? There was a website that was created to. No, no. Did you consider already existing? There was nothing in the evidence to suggest that there was a particular social media platform that entertainers would avail themselves to. The conclusion, and the court agreed, was that traditional mailing in a discrete mailing to the last known address with follow-ups for all returned envelopes would be the most effective way to communicate via the mail, and posting posters in all of the dressing rooms for all 10 of the clubs was the back-up way to get it done. We did not have e-mail addresses, and you can't send an e-mail to someone when you don't have their e-mail address. Did you talk with the opposing counsel on the way she and others who apparently have been really, really, really successful in these kinds of things on how they did notice to their clients? We did not consult with counsel on that topic, Your Honor. We were confident that the notice was adequate, and frankly, an 18 percent response rate in an exotic dancer class action is not bad. Did she complain before the court about the notice, and did she suggest these other ways as a possibility? I believe she did argue at the hearing that additional notice would improve the process. Well, it seemed like kind of old world. I mean, you know, all kinds of people figure out how to get to people politically through the Internet. It seems like you didn't explore that at all. It seems like it's old school that you follow. Again, I would say that because of a desire to protect the privacy of the e-mailing and to put a poster up in the dressing room. And that was — it yielded an 18 percent response rate, which in this type of case is not bad. Sorry. There's always a problem in terms of these times. Paul Bland. I represent the settling plaintiffs in this case. First, I wanted to say, I feel like Judge Beeler has been really mistreated so far here. The Court below looked at cases, all the cases cited, where cases have gone well for plaintiffs. The Court also looked at a number of cases that went badly for plaintiffs on the merits, where cases — there were cases tried to juries and lost. There were cases dismissed on summary judgment. And the Court simply found in the record at several different places that the cases that were — that showed that there was a substantial litigation risk were more persuasive and more on point than the cases where people had had really big successes. The second point. Counsel, we review district and magistrate judge judgments all the time. And they may be good judges or bad judges, but we review them and we mean no disrespect for them, but we may or may not agree with them. So I hope you don't think that we're being mean to Judge Beeler. No, I didn't mean from the Court, Your Honor. I meant that it was suggested that the district court by objectors had just rotely followed this and hadn't taken it seriously. That's not true. There were lengthy hearings in front of Judge Beeler in which all these cases were discussed in briefs. And then there were a series of colloquies of Judge Beeler. So at pages 80 and 188 to 189 of the record, Judge Beeler actually has back-and-forth with objectors and says, I see those cases and I also see these other cases and see a problem. And as we review the notice provisions and the fairness and so on, what is the standard of review that we operate under? So the standard of review is that absent a strong showing of clear abuse of discretion that the district court's decision that a settlement is fair, reasonable, adequate is to be affirmed. So a strong showing of clear abuse of discretion. But don't we also look, though, how does it factor in, you know, where you have a class that's not certified, then the analysis that the trial court, the magistrate in this case, had to do is an elevated standard. And beyond that, where you have a free sailing provision with regard to attorney's fees, that likewise calls for an elevated standard, right? And I think that the court, the district court looked at both of those facts and did, in fact, apply an elevated standard. But there's a substantial reversion. So the settlement could have been $5 million and there was a million dollars that was not claimed from the cash settlement, from the cash part of the settlement. So there was a substantial reversion and the district court saw that and took account of that and didn't consider that. And the use of coupons is yet another flag. Well, Your Honor, I strongly disagree with the description of this as a coupon. The dancer fee provision that has been suggested as a coupon, so 75 class members have filed claims so far and have received $5,000 or just under $5,000 each. That provision that they can make claims for that particular part of the relief, that tier of the relief, lets them continue to make claims for two years. Now, once there were objections and the settlement was on hold, essentially, then the signs and advertisements for that went down, and so people stopped making claims. There have been promises in the district court from the defendant that if the settlement is approved, they will go again. It's still two years from final approval. And for that tier of relief, you've already had 37 percent of that tier of relief that's been claimed. Then over two years, to the extent dancers have received over 5,000 or up to they've received an average of under $5,000, some have received as much as $8,000 for that tier. Have you ever tried one of these cases? Sorry, what? Have you ever tried one of these cases? No, Your Honor. I'm actually a specialist in challenging the arbitration clauses, so I was the one who handled the first appeal here. And that continues to be a really substantial element of litigation risk in this case, quite frankly. The way that we were successful in defeating the arbitration clause to make it possible so that 800 class members would be filing claims in this case was because we did not sue the clubs. We sued the management companies. The clubs had an arbitration clause. The management company did not. And what this Court found was that we had been able to establish that they had not met their burden of proof to show the management companies and nonparty could claim the arbitration clause. But the clubs are getting benefits a lot of the settlement. So as part of the – in order to have the injunctive relief work well and to change the litigation practice of the clubs, once the management company was arguably on the hook, if we're able to win everything, then we were able to bring the clubs to the table in a way that we wouldn't have been able to have done if we had been forced into arbitration. But the problem – Your – maybe I shouldn't call you your opponent, but the Objectors' Council mentioned here and I think in the brief a number, quite a few other settlements in exotic dancer cases around the country, you know, where the recovery in the settlement was, you know, much, much higher, right? Into the thousands. There have been some that have been higher. Now, what I want to ask is, were those cases brought to Judge Bieler's attention? And if so, what was her reaction to that? They were brought to her attention. They were discussed at length. And cases that were defense verdicts were brought to her attention. Cases that were lower settlements were brought to her attention. Cases with much lower claims redemptions were brought to her attention. And she evaluated them. And she determined that based on the litigation risks in this case in particular, as the facts were developing, that this was a fair and reasonable adequate settlement. She found the cases that showed that there were risks were closer on point than the cases where there had been significant risks. Well, let's talk about litigation risks for a minute. Please, Your Honor. If you got, you know, you brought claim against the management company because you were able to get around then the arbitration clause. Well, if you tagged in the management company, they might third party in to the original action or later bring action against the clause. And that would be their problem. But you had a straight shot at the management company, so you shouldn't have the same amount of litigation risk. Well, I hope that that's true. I think that the litigation risk for us is are we going to be able to show that the management company ultimately is responsible for, to the extent the clubs are the ones who are paying. It was a fairly novel theory. So I think that Mr. Tidrick, who had originally brought this case, was creative and thought about this in an interesting way. There's not a string of cases in which people have been successful against management companies. So I think that one of the things that we're facing is as evidence starts to develop, are we going to be able to successfully beat them? If this Court throws out the settlement, we will go back and we will fight over who's going to be the lead counsel under Rule 23G. And if the district court picks us, we will do our very, very best to hold the management company responsible. But it's the idea that this is a slam dunk. Also, you know, there was evidence that came in, if I can just say, that indicated that the total value of the claims here were $4.7 million from their accountant. And so while you hear this saying, oh, well, the case is worth $120 million, the only person that actually went through and did an analysis on the record, Ms. Marti, M-A-R-T-I-E, all over both of our briefs, actually analyzed and said the claims were worth about $4.7 million. So if that's right, and this is a $4.7 million case, and we got about $4 million, it's a pretty good settlement. Of course, if this class would have been certified, then the Court would have decided who's going to be lead counsel. Yes. Wouldn't be scrapping. Right. Well, it's a common thing for objectors to come in and file a Rule 23G motion now and say, you know, we feel that counsel are doing a terrible job. The district court had an opportunity to watch Mr. Titterick and his firm. You know, we were really involved in the appeal. But the district court had eyes on both sets of lawyers pretty closely. Thank you, counsel. Let me ask my colleagues. Do you have any time left? I can't remember. Do you have any time left? I don't think so. Let me ask my colleagues, do any of you have any additional questions? No. I do not. I think you've done a fine job. We have your points, so we thank you all. And the case that's argued is submitted. She should have watched the clock. What? She should have watched the clock. Oh, I know. She does. Anyway, we stand in recess for the day. Okay. Thank you. All rise.
judges: Tashima, M. Smith, Piersol